Filed 12/3/14  Backflip Software v. Cisco Systems CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BACKFLIP SOFTWARE, INC.,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CISCO SYSTEMS, INC.,<br><br>  Defendant and Appellant. | H040382<br>(Santa Clara County<br> Super. Ct. No. CV242234) |

## I.  INTRODUCTION

Appellant Cisco Systems, Inc. (Cisco) entered into a software license agreement and an escrow agreement with respondent Backflip Software, Inc. (Backflip), the licensor of the software.  After Backflip ceased its operations and the source code for its software was released from escrow to Cisco, a dispute arose regarding the escrow release and Cisco's rights to the software.  Backflip filed this action alleging that Cisco was liable for misappropriation of Backflip's trade secrets and conversion.  Cisco filed a petition to compel arbitration and stay proceedings.  The trial court found that the arbitration clause in the escrow agreement did not apply to the parties' dispute because escrow had closed and denied the petition to compel arbitration.

On appeal, Cisco contends that the trial court erred because the arbitration clause in the parties' escrow agreement must be interpreted to require an arbitrator to determine

whether Backflip's software was properly released from escrow to Cisco. For reasons that we will explain, we conclude from our independent review that Backflip's claims in the present action are not covered by the arbitration clause in the parties' escrow agreement, and therefore we will affirm the order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Software License Agreement*

Cisco and Backflip entered into a software license agreement that became effective in November 2010. The agreement states: "The parties desire that [Backflip] license the Software to allow Cisco to use the Software internally in conjunction with other Cisco Products to provide a Hosted Service to End Users and/or End User's customers."

The software license agreement includes one paragraph—paragraph 17.3 entitled "Mandatory Mediation"—regarding alternative dispute resolution. Paragraph 17.3 states in part: "With the exception of alleged breaches of confidentiality or proprietary rights provisions, or disputes related to security vulnerabilities, neither party may file a lawsuit until the completion of the mediation described in this Section. . . . In the event that a dispute related to this Agreement also forms the basis of a claim that there should be a release of the Escrow Materials (as defined in the Escrow Agreement), any such dispute shall be governed by the expedited binding arbitration provision described in Section 10.1 of the Escrow Agreement."[1]

### B. *Escrow Agreement*

The escrow agreement states that "[Backflip] shall deposit with Escrow Agent, within ten (10) business days after execution of this Escrow Agreement, one (1) complete copy of the Escrow Materials. . . . 'Escrow Materials' as used in this Escrow Agreement

---

[1] The record reflects that the arbitration clause in the escrow agreement is actually paragraph 9.1, not 10.1.

shall mean: (1) the Software, related documentation, and other property, as licensed under the License Agreement and set forth in Exhibit A hereto; and (2) all Software updates, Error corrections, enhancements and modifications . . . ." (Boldface omitted.)

The escrow agreement further provides for the release of the escrow materials in specified circumstances, as follows: "The deposited Escrow Materials and Updates will be delivered to Cisco by Escrow Agent upon the earliest of one of the events set forth below ('Releasing Events')[.]" (Boldface omitted.) One of the specified "Releasing Events" occurs "[i]f [Backflip] discontinues its maintenance and/or support of the Software . . . or is otherwise in breach of its support obligations under the terms of the License Agreement . . . ."

When a releasing event occurs, the escrow agreement states that the "Escrow Agent shall be authorized to release the Escrow Materials to Cisco upon receiving written authorization from Cisco certifying that Cisco is entitled to the Escrow Materials (the 'Notice') . . . ." (Boldface omitted.) After receiving Cisco's notice, the escrow agent is required to deliver the notice to Backflip.

The terms of the escrow agreement also provide that if Backflip believes that the releasing event specified by Cisco did not occur, Backflip may deliver a counternotice to the escrow agent. Where Backflip does not deliver a counternotice, and Cisco does not withdraw its notice, the escrow agreement requires the agent to deliver the escrow materials to Cisco.

In the event that Backflip delivers a counternotice, the escrow agreement provides for binding arbitration in the following arbitration clause at paragraph 9.1: "[Backflip] and Cisco agree that, if the Counternotice is given by [Backflip] . . . the parties shall submit the dispute to expedited binding arbitration . . . . The sole question before the arbitrator shall be whether there existed, at the time Cisco transmitted the Notice to Escrow Agent, the conditions permitting release of the Escrow Materials. . . . If the arbitrator finds that the Notice was properly given by Cisco, then the arbitrator shall

3

order the Escrow Agent to promptly and immediately release the Escrow Materials to Cisco.  If the arbitrator finds to the contrary, then the Arbitrator shall order the Escrow Agent not to release the Escrow Materials.  . . .”

### C.  *The Complaint*

Backflip filed the complaint in this action in March 2013.  According to the complaint's allegations, in 2010 Backflip entered into a software license agreement with Cisco that permitted Cisco to use Backflip's software.  The software license agreement also provided that Cisco would pay royalties to Backflip from the end user fees received by Cisco.  Backflip claims that Cisco never paid any compensation or royalties to Backflip.

Backflip further alleges that in January 2011, Backflip's CEO, Gil Perez, informed Cisco that Backflip had laid off all of its employees and intended to cease business operations, including service and maintenance of Backflip's software.  Perez then delivered the source code for the Backflip software to the escrow agent, NCC Group, Inc. (NCC Group).  According to Backflip, Cisco knew or should have known that when Perez delivered the source code into escrow, he was no longer an officer of Backflip and did not have authority to do so.

After the source code was placed into escrow, Perez gave Cisco written notification that as of January 25, 2011, Backflip would stop responding to any maintenance requests from Cisco.  Two days later, on January 27, 2011, Cisco gave formal written notice to NCC Group that an event had occurred that permitted release of Backflip's escrow materials, including its source code, to Cisco.  In response, NCC Group sent a January 31, 2011 written notice of release event to Cisco and Perez, although Perez was, according to Backflip, no longer CEO of Backflip.  Backflip alleges that its source code was improperly delivered to Cisco in February 2011 and since that time Cisco "has exercised full dominion, control, use and discretion over Backflip's Software and property, and has treated it as if it had full ownership and title to it."

4

Based on these and other allegations, Backflip asserts causes of action for misappropriation of trade secrets (Civ. Code, § 3426 et seq.), conversion, and unjust enrichment.

**D.** *Petition to Compel Arbitration*

In October 2013 Cisco filed a petition to compel arbitration and stay the proceedings. Cisco argued that the gravamen of Backflip's lawsuit was its claim "that Cisco improperly secured the release of the Escrow Materials." Under Cisco's interpretation of the alternative dispute provisions in the software license agreement and escrow agreement, the parties had agreed to expedited arbitration of "any claims relating to the improper release of the Escrow Materials."

Backflip filed opposition to the petition to compel arbitration and stay the proceedings. In its points and authorities, Backflip disputed Cisco's characterization of the parties' agreement to arbitrate, contending that the arbitration clause in the escrow agreement narrowly provided that the arbitrator would decide if the materials in escrow should be released. Backflip emphasized that the arbitration clause in the escrow agreement expressly stated that "[t]he sole question before the arbitrator shall be whether there existed, at the time Cisco transmitted the Notice to Escrow Agent, the conditions permitting release of the Escrow Materials." (Boldface omitted.)

Based on that provision in the escrow agreement, Backflip insisted that "[t]he one question for arbitration, whether a releasing event occurred, is long moot [*sic*], since the [source] code was released long ago." Additionally, Backflip asserted that its claims were not limited to improper release of its source code from escrow, but also included claims that Cisco had wrongfully exercised propriety rights over Backflip's software after the escrow release. Backflip also argued that Cisco had waived arbitration by failing to demand arbitration before filing its demurrer to the complaint.

5

**E.** *Trial Court Order*

The trial court denied Cisco's petition to compel arbitration and stay the proceedings in its November 3, 2013 order. The order states in part: "The sole basis asserted by [Cisco] for compelling arbitration is paragraph 9 of the Escrow Agreement which is, in turn, Exhibit G to the License Agreement. The Court concludes that the language of the Escrow Agreement which compels arbitration is limited in scope to the conduct of the escrow itself. Upon close of escrow with delivery of the materials, its usefulness is terminated. . . . While the arbitration necessarily depends on determining whether the conditions permitting release have been satisfied, the task of making that decision does not survive the close of escrow for the purpose of establishing the rule of this case."

## III.  DISCUSSION

On appeal, Cisco contends that the trial court erred in denying its petition to compel arbitration because the parties agreed to arbitrate the issue of whether Backflip's software was properly released from escrow. According to Cisco, "[t]he arbitrator can still make binding findings concerning the existence and legitimacy of events leading to that release—findings that run to the very core of Backflip's misappropriation claims."

Since the issue of whether the parties agreed to arbitrate Backflip's claims turns on the interpretation of the escrow agreement's arbitration clause, we will begin our evaluation with an overview of the rules governing the interpretation of arbitration agreements and the applicable standard of review.

**A.**  *Interpretation of Arbitration Agreements*

"Title 9 of the Code of Civil Procedure, as enacted and periodically amended by the Legislature, represents a comprehensive statutory scheme regulating private

6

arbitration in this state. ([Code Civ. Proc.,] § 1280 et seq.)[2] Through this detailed statutory scheme, the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.]" (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.)

However, " '[i]n cases involving private arbitration, "[t]he scope of arbitration is . . . a matter of agreement between the parties" [citation], and " '[t]he powers of an arbitrator are limited and circumscribed by the agreement or stipulation of submission.' " [Citations.]' [Citation.] . . . Accordingly, policies favoring the efficiency of private arbitration as a means of dispute resolution must sometimes yield to its fundamentally contractual nature, and to the attendant requirement that arbitration shall proceed *as the parties themselves have agreed*. [Citation.]" (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 830-831.)

In other words, as this court has stated: " 'The scope of arbitration is a matter of agreement between the parties.' [Citation.] 'A party can be compelled to arbitrate only those issues it has agreed to arbitrate.' [Citation.] Thus, 'the terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested.' [Citation.] For that reason, 'the contractual terms themselves must be carefully examined before the parties to the contract can be ordered to arbitration' by the court. [Citation.]" (*Molecular Analytical Systems v. Ciphergen Biosystems, Inc*. (2010) 186 Cal.App.4th 696, 705 (*Molecular*).)

"In determining the scope of an arbitration clause, '[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation].' [Citation.]" (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744

---

[2] All statutory references hereafter are to the Code of Civil Procedure unless otherwise indicated.

(*Victoria*).) "When the contractual language is clear, there is no need to consider extrinsic evidence of the parties' intentions; the clear language of the agreement governs. [Citations.]" (*Efund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1322.) " 'However, doubts as to the scope of an agreement to arbitrate are to be resolved in favor of arbitration.' [Citations.]" (*Molecular*, *supra*, 186 Cal.App.4th at p. 705.) "The party opposing arbitration has the burden of showing that the agreement, as properly interpreted, does not apply to the dispute. [Citations.]" (*Ibid.*)

An order denying a petition to compel arbitration is an appealable order. (§ 1294, subd. (a).) Our standard of review is well established. "When 'the language of an arbitration provision is not in dispute, the trial court's decision as to arbitrability is subject to de novo review.' [Citation.]" (*Molecular*, *supra*, 186 Cal.App.4th at p. 707.)

**B.** *Analysis*

Cisco contends that the release of Backflip's source code from escrow in 2011 does not, as the trial court determined, render the arbitration clause in the parties' escrow agreement moot. The correct interpretation of the arbitration clause, according to Cisco, is that the parties have a continuing duty to arbitrate the key issue of whether the escrow agent's release of Backflip's source code from escrow was proper. Cisco also points to paragraph 17.3 in the license agreement as showing the parties' intention that any claim relating to the release of the escrow materials would be subject to binding arbitration.

In Cisco's view, there is nothing in the parties' agreements to suggest that the parties intended that their duty to arbitrate the key issue of whether the escrow release was proper would terminate with the release of the escrow materials. Cisco urges that its interpretation is consistent with the public policy favoring arbitration, as well as the parties' intention that disputes regarding the release of Backflip's software from escrow should be resolved expeditiously. Cisco relies on this court's decision in *Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534 (*Ajida*) for its

contention that Backflip's contractual duty to arbitrate survived termination of the escrow agreement.

In response, Backflip argues that Cisco is attempting to rewrite the arbitration agreement. Backflip asserts that the plain language of the narrow arbitration clause in the escrow agreement does not encompass the claims in Backflip's complaint, since the arbitration clause expressly provides for arbitration of whether the escrow agent "must 'promptly and immediately release the Escrow Materials to Cisco.' " According to Backflip, arbitration now would be futile because "[t]he escrow has been terminated, [and] the escrow agency has no materials in escrow . . . ." Backflip also points to the forum selection clause[3] in the license agreement as indicating that the parties did not intend to arbitrate claims outside the narrow scope of the escrow agreement's arbitration clause.

Having independently reviewed the undisputed language of the parties' arbitration agreement (*Molecular*, *supra*, 186 Cal.App.4th at p. 707), we determine that Backflip has met its burden to show that under a proper interpretation, the agreement does not apply to Backflip's claims in the present action. (See *ibid.*) Our determination is based upon the general rule that "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.)

In this case, the parties' agreements refer to arbitration in two places. First, paragraph 17.3 of the software license agreement states in part: "With the exception of

---

[3] Paragraph 17.13 of the license agreement states in part: "The exclusive jurisdiction and venue of any action with respect to the subject matter of this Agreement shall be the state courts of the State of California for the County of Santa Clara or the United States District Court for the Northern District of California and each of the parties hereto submits itself to the exclusive jurisdiction and venue of such courts for the purpose of any such action."

alleged breaches of confidentiality or proprietary rights provisions, or disputes related to security vulnerabilities, neither party may file a lawsuit until the completion of the mediation described in this Section. . . . *In the event that a dispute related to this Agreement also forms the basis of a claim that there <u>should be</u> a release of the Escrow Materials* (as defined in the Escrow Agreement), *any such dispute shall be governed by the expedited binding arbitration provision described in Section [9.1] of the Escrow Agreement.*"  (Italics and underscoring added.)

Second, paragraph 9.1 of the escrow agreement states in part:  "[Backflip] and Cisco agree that, if the Counternotice is given by [Backflip] . . . the parties shall submit the dispute to expedited binding arbitration . . . .  The sole question before the arbitrator shall be whether there existed, at the time Cisco transmitted the Notice to Escrow Agent, the conditions permitting release of the Escrow Materials. . . . *If the arbitrator finds that the Notice was properly given by Cisco, then the arbitrator shall order the Escrow Agent <u>to promptly and immediately release the Escrow Materials</u> to Cisco.  If the arbitrator finds to the contrary, then the Arbitrator shall order the Escrow Agent <u>not to release the Escrow Materials</u>. . . .*"  (Italics and underscoring added.)

Our careful review of the plain language of paragraph 17.3 in the software license agreement and paragraph 9.1 in the escrow agreement persuades us that the parties intended that the only issue that could be arbitrated was whether the escrow materials that were currently in the possession of the escrow agent should be released under the terms of the escrow agreement.  As stated in paragraph 17.3 of the license agreement, the issue to be arbitrated was whether the escrow materials "should be released," not whether the escrow materials "should have been released."  The plain language of paragraph 9.1 of the escrow agreement also clearly refers to escrow materials that are currently in possession of the escrow agent, since the arbitrator's decision is limited to (1) a threshold determination of whether the conditions permitting release of the escrow materials

10

existed; and (2) depending upon the outcome of that threshold determination, ordering the escrow agent to either release the materials or not release the materials.

We therefore agree with the trial court that the scope of the parties' arbitration agreement, as set forth in paragraph 17.3 of the license agreement and paragraph 9.1 of the escrow agreement, encompassed a dispute regarding the release of Backflip's escrow materials while those materials remained in the possession of the escrow agent. Once the escrow agent released the escrow materials to Cisco, the arbitration agreement no longer applied. Contrary to Cisco's arguments, we see nothing in the plain language of the arbitration agreement that implies an intention by the parties that a subsequent issue arising in a civil action as to whether the escrow materials were properly released by the escrow agent to Cisco would be subject to binding arbitration. We reiterate that "[a]lthough '[t]he law favors contracts for arbitration of disputes between parties' [citation], ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." ' [Citations.]" (*Victoria*, *supra*, 40 Cal.3d at p. 744.)

The decisions on which Cisco relies for the proposition that an arbitration clause survives the termination of the contract containing the arbitration clause, including *Ajida*, *supra*, 87 Cal.App.4th 534 and *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677 (*Coast Plaza*), do not compel a contrary conclusion since those decisions are distinguishable.

In *Ajida,* the broad arbitration clause in the underlying agreement required the parties to arbitrate " '[a]ny disputes' " over the agreement. (*Ajida*, *supra*, 87 Cal.App.4th at p. 543.) The issue on appeal was whether "the arbitrators [in their final arbitration award] exceeded their authority in extending the arbitration and fee provisions from the parties' terminated contract to future controversies." (*Id.* at p. 540.) Applying a deferential standard of review to the arbitrators' determination that they acted within the scope of their powers, this court determined that the arbitrators' fashioning of "a remedy

11

that contained a mechanism for future dispute resolution. . . [was] rationally drawn both from the agreement as interpreted and from the circumstances that gave rise to its termination. We are therefore compelled to affirm the arbitrators' award." (*Id*. at p. 545.) In so ruling, this court stated that "a party's contractual duty to arbitrate disputes may survive termination of the agreement giving rise to that duty." (*Ibid*.) This court also relied on "guidance in California's statutory scheme, which explicitly recognizes that written agreements to arbitrate may be 'extended or renewed by an oral or implied agreement.' [Citation.]" (*Ibid*.) In contrast, the present case does not involve a broad arbitration clause, an oral or implied agreement to extend or renew the arbitration agreement, or a dispute about the arbitrators' power to fashion a remedy.

In *Coast Plaza*, the underlying service agreement containing the arbitration clause expressly provided for dispute resolution after termination of the service agreement: " 'After the effective date of termination, this Agreement *shall remain in effect for the resolution of all matters unresolved as of that date.*' " (*Coast Plaza*, *supra*, 83 Cal.App.4th at pp. 682-683.) The appellate court found that the arbitration clause was "very broad" and clearly showed the parties' agreement to "arbitrate '*any* problem or dispute' that arose under or concerned the terms of the Service Agreement." (*Id*. at p. 684.) The decision in *Coast Plaza* is obviously distinguishable from the present case, in which the arbitration clause is very narrow and the underlying agreements do not provide for arbitration of an escrow issue after the termination of the escrow agreement.

For these reasons, we conclude that the trial court did not err in denying Cisco's petition to compel arbitration and stay the proceedings, and we will affirm the November 3, 2013 order.

## IV. DISPOSITION

The November 3, 2013 order denying Cisco System, Inc.'s petition to compel arbitration and stay the proceedings is affirmed. Costs on appeal are awarded to respondent Backflip Software, Inc.

12

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:



_____
ELIA, ACTING P.J.




_____
MIHARA, J.